## Frank, et al. v. South, et al.

(Decided May 4, 1917.)

Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Physicians and Surgeons—Practice of Medicine.—The term "practice of medicine," in statutes regulating the practice of medicine, is to be understood in its popular sense.

2. Physicians and Surgeons—Practice of Medicine.—The term "to treat any human ailment by any method" means to undertake to effect a cure of a human ailment by any method.

3. Physicians and Surgeons—Practice of Medicine.—To attempt the cure of a human ailment, regardless of the character of the method, means that the one undertaking the cure must necessarily diagnose the symptoms of the disease, determine what the disease is, prescribe the remedy, and administer it, either in person or by directions to someone who is associated with the patient.

4. Physicians and Surgeons—Nurses—Administration of Anesthetics.—A trained nurse, who administers anesthetics to a patient undergoing or about to undergo a surgical operation, in the presence of and under the immediate supervision and direction of the surgeon in charge, who prescribes the anesthetic to be used and directs the manner of its use, the nurse neither diagnosing the disease

nor prescribing the kind of anesthetic, is not engaged in the "practice of medicine," within the meaning of Chapter 85, Ken-tucky Statutes.

5. Physicians and Surgeons—Administration of Anesthetics—Nurses—Assistants.—The surgeon, in the selection of an assistant to administer an anesthetic to a patient, undergoing a surgical operation, must exercise the same degree of care and skill as he is required by law to exercise in the performance of any part of the operation.

A. J. CARROLL for appellants.

M. M. LOGAN, Attorney General; STANLEY E. SLOSS and KOHN, BINGHAM, SLOSS & SPINDLE for appellees.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

The appellees are the members of the State Board of Health. The facts agreed upon and upon which the action is based will definitely describe the personnel of the appellants and their interest in the controversy, as well as the question to be determined. The action is an agreed one. The statement of facts agreed upon is substantially as follows:

The appellant, Louis Frank, is a duly licensed physician and surgeon and has complied with all of the requirements of the law, which regulate the practice of medicine, in this state. However, he limits his practice to surgery. The appellant, Margaret Hatfield, is a duly licensed and trained nurse and has complied with all the requirements of the statutes relating to graduate or trained nurses; has had more than six years' experience as such and has made a special study of administering anesthetics to patients, submitting to surgical opera-'tions, and has taken a special course of instruction upon that subject, and has administered anesthetics to more than twelve hundred patients, who have undergone surgical operations, but she has never taken an examination for the purpose or obtained a certificate from the State Board of Health, which would authorize her to administer anesthetics or to engage in the practice of medicine, and does not have any license, which authorizes her to practice medicine in any of its branches, either in this state or elsewhere. She is employed by her co-appellant, Frank, to administer anesthetics to patients upon whom he performs surgical operations. He directs the kind of anesthetic to be administered, and the administration, in each case, is made by her under his

personal directions and supervision, in so far as it is possible for him to supervise and direct her work. She does not administer anesthetics under any other circumstances, nor as an employee of any other physician or surgeon, and is compensated for her services by Dr. Frank. She has not opened an office nor announced to the public, in any way, a readiness to treat the sick or afflicted, nor has she ever prescribed for any one or treated any human ailment or infirmity by any method, unless the administration of anesthetics to patients, under the circumstances stated, is a treatment or a human ailment. Some of the medical associations and organizations of physicians and surgeons, in the United States, approve the employment of graduate or trained nurses to administer anesthetics to patients upon whom surgical operations are performed, and many surgeons in the United States employ such nurses for that purpose. The usual practice, in this state, in cases where graduate or trained nurses are in attendance, has been for such nurses to administer hypodermics of morphia, atropia, ergot, and other drugs, when same were directed to be given by the physician in charge, in definite doses and at definite intervals, and frequently such is done by the nurses in the absence of the physician, but in accordance with his directions. The administration of anesthetics, in surgical cases, in this state, has been usually performed by physicians. The usual practice, in this state and elsewhere, in surgical operations, where a graduate or trained nurse is in attendance, is for such nurse to prepare the patient for operation and to sterilize the instruments and dressing used in the operation and to administer medicine and drugs prescribed by the physician to the patient. In addition to the truth of the foregoing facts to which each party agreed, it was agreed, that each party might show by affidavits the usual custom as to the administration of anesthetics by trained nurses in the country at large, and the practice, in this state, as to persons, who are not licensed physicians administering anesthetics. There was evidence to the effect that at several hospitals in this state it had formerly been the practice for persons other than licensed physicians to administer anesthetics to patients undergoing surgical operations and that at one hospital, it is the practice for trained nurses to do such work, but the practice of permitting any one except a

licensed physician to administer anesthetics to patients undergoing surgical operations has been discontinued in all such hospitals, except one. It was, also, shown, that until recent years, at the city hospital, in a large city in the state, the practice had been for the students at a medical college to perform such duties, but that same has been discontinued at that hospital, and that now such work is done by licensed physicians. It was further shown that until in recent years the administration of anesthetics had been done to a considerable extent by unlicensed medical students, but at the present time, licensed physicians were employed for the service in this state as an ordinary rule. It was, however, shown, that in the country at large, while the most usual practice was to employ licensed physicians for such services, that at many of the large and most noted hospitals trained nurses were employed for the service by many of the most learned and most skilful surgeons—notably at the Mayo Clinic, where one hundred thousand surgical operations have been performed, at which the anesthetics were invariably administered by trained nurses. The record fails to show, that in the examination of physicians for certificates by the State Board of Health, that any examination is made specially touching their qualifications as anesthetists, and that in the examination before the board for the examination of trained nurses no special examination is made touching upon that subject.

The appellees insist, that, upon the facts agreed upon and the proof on file, that the appellant, Margaret Hatfield, is practicing medicine within the meaning of the law in this state, while the contrary is the contention of the appellants. The court below held to the view of the appellees and hence this appeal.

The authority of the legislature to regulate the practice of medicine, as a profession requiring special training for the proper performance of its duties and to require persons before engaging in such services, to undergo an examination by an authorized board and to obtain a certificate or license, as the authority to engage in the practice, and to place a penalty upon such as undertake such practice without a license or certificate is unquestioned. Driscoll v. Commonwealth, 93 Ky. 393; Webster v. State Board of Health, 130 Ky. 191; Hargan v. Purdy, 93 Ky. 424.

The evidence discloses a variety of opinions as to whether women or men make the safer and more efficient anaesthetists, or whether trained nurses educated for the purpose or licensed physicians are the more competent for the work of administering anesthetics to patients undergoing surgical operations. Some of the opinions are to the effect that the work of an anaesthetist is most responsible, and that upon his or her competency and efficiency depends in some measure the success of the operation and in a large measure the safety of the patient, while others seem to hold to the opinion that the administering of the anesthetic should be attended with little danger to the patient, if the surgeon has properly performed his studies in the examination of the patient beforehand to discover his physical condition and whether there is any reason existing, why a certain anesthetic should not be administered, and to what extent and in what quantity it should be administered, and thus equip himself to be able to give the necessary directions to the anaesthetist. There is not any contention that a nurse trained for the purpose is not thoroughly competent for such duties or that appellant, Hatfield, is not qualified for the work, and both sides to the controversy agree, that one, to administer anesthetics safely and efficiently, must have training and experience for such purpose in order to be efficient and competent for the service, and this seems to go without question, whether the anaesthetist is a licensed physician or a trained nurse. Some of the opinions are to the effect that the licensed physicians, taken as an entire body, contain a very large number of members, who are not qualified for such duties, never having made a special study of it and being without experience. The above differences of opinion are, however, questions for discussion and investigation by the members of the medical profession, and many of these questions should doubtless be settled by legislative action. The only question, which this court can determine and which it is authorized to determine, is whether the work performed by appellant, Hatfield, is the practice of medicine within the meaning of the law upon the subject. If it is, then she must discontinue such practice until she shall have undergone an examination and received a certificate from the appellee, Board of Health, authorizing her to do so, otherwise her conduct is penalized by the laws of

this state against empiricism. It will not be without profit to advert somewhat to the history of legislation, in this state, touching the practice of medicine and kindred subjects and the purpose of such legislation. It will be called to mind that the legislative authority in this state has already adopted statutes, which control and regulate the practice of medicine, of dentistry, of pharmacy and the profession of trained nursing, and it should furthermore be observed, that these laws have not been enacted for the peculiar benefit of the members of such professions, further, than they are members of the general community, but they have been enacted for the benefit of the people. The enactment of the statute, which regulates the practice of medicine, has been held to have been done to protect the people at large, against persons who undertake to treat the sick and afflicted from knowledge gained from experience and who know nothing of science or principles, and from quacks, both of which classes hold themselves out as physicians and surgeons, and mislead unsuspecting persons to rely upon and place the safety of their health in their hands. Webster v. State Board of Health, *supra;* People v. Gordon, 194 Ill. 560.

The legislature having authority to determine of what the practice of medicine consists, and to regulate it by reasonable requirements of those, who engage in it and to penalize the violations of the laws pertaining to it, the question in the instant case, must be determined by a reference to the statutes, as the statutes undertake to define what the practice of medicine is and under what circumstances it may be engaged in. Chapter 85, Kentucky Statutes, which regulates the practice of medicine and surgery by section 2613, makes it unlawful for any person to practice medicine in any of its branches within the limits of this state, who has not registered in the county clerk's office in the county in which he resides a certificate of the State Board of Health authorizing him to engage in the practice. Other sections of the statute prescribe under what conditions the State Board of Health may grant certificates to persons desiring to engage in the practice of medicine, and prescribe the manner of their examination, the extent of the examination and the branches touching which it is necessary to give them an examination. When the statute was first enacted it had application only to per-

sons who sought to treat ailments by purely medical
agencies, and under that statute the practice of medicine
was defined to be the treatment of the sick by medical
agencies, as commonly practiced throughout the state
at the time the act was passed, and furthermore, that
one practicing osteopathy was not engaged in the prac-
tice of medicine. Nelson v. State Board of Health,
*supra.* The statute in question, furthermore provided,
that there should not be any discrimination against any
peculiar school or system of medicine. Thereafter the
statute was so amended as to include the practice of
treating persons by the methods of osteopathy within
the meaning of the words, "to practice medicine." The
legislature then undertook to determine what the term,
"practice of medicine," as used in the statute, should
be construed to mean, and in so doing it enacted sub-
section 5, of section 2615, Kentucky Statutes, and which
is as follows:

"Any other person applying for authority to treat
the sick or injured or in any way discharge the duties
usually performed by physicians, whether by medical,
surgical or mechanical means, shall apply to the State
Board of Health, who shall examine them as to their
competency in such manner as they may deem fair and
best, but such examination shall always include anatomy,
physiology, and pathology, and the term, "practice of
medicine" as used in this act, shall be construed to be
the treatment of any human ailment or infirmity by any
method; but this shall not include trained or other
nurses, or persons selling proprietary medicines when
not traveling as a troupe or troupes composed of two or
more persons. But this act shall not apply to the prac-
tice of Christian Science."

By section 2618, *supra,* another thing was declared
to be the practice of medicine within the meaning of the
act and that was, "To open an office for such purpose
or to announce to the public in any way a readiness to
treat the sick and afflicted, shall be deemed to engage
in the practice of medicine within the meaning of this
act."

The last mentioned section, *supra,* is the one which
imposes a penalty for any violation of the law against
empiricism, and imposes a penalty upon "any person
living in this state or any person coming into this state,
who shall practice medicine or attempt to practice medi-

cine in any of its branches, or who shall treat or attempt to treat any sick or afflicted person by any system or method, whatsoever, for reward or compensation, without first having complied with the provisions of this law, shall, upon conviction thereof, be fined fifty dollars, and upon each subsequent conviction shall be fined one hundred dollars and imprisoned thirty days, etc."

The treatment of any human ailment or infirmity by the use of medical agencies, in a popular sense, is well understood. The meaning in which the legislative authority intended the term "practice of medicine" to be understood in a statute, which makes the practice of medicine to consist of the treatment of diseases by medical agencies, is the popular sense in which that term is used and understood. Nelson v. State Board of Health, *supra;* State v. Mylod, 40 Atl. 753; Stewart v. Raab, 56 N. W. 256. In other jurisdictions the courts have defined the meaning of the term "to practice medicine," but in most of the instances they were merely defining the term under certain statutory regulations, and the statutes not being altogether similar to ours, very little help is rendered, by such decisions, in an attempt to define the term as used in our statutes. The Supreme Court of Kansas, in Underwood v. Scott, 23 Pac. 942, defined the practice of medicine in a way which seems to accord with reason and authority. It defined it thus:

"First, in adjudging the nature, character and symptoms of the disease; second, in determining the proper remedy for it; third, in giving or prescribing the application of the remedy to the disease."

It seems, that it would be impossible, to practice medicine in any sense in which the term could be used, without the practitioner making a diagnosis of the symptoms of the patient, and to determine what disease the patient is afflicted with, and then to determine and prescribe, what remedy should be used, in attempting to treat the ailment or infirmity with which the patient is suffering. The mere giving of medicines, which are prescribed by a physician in charge, who has made a diagnosis and determined the disease, and determined the remedy and directs the manner and the time and the character of the medicines to be administered, has never been considered engaging in the practice of medicine. The person who administers medicine under such a state of case, does not exercise any judgment as to the character of the disease nor the necessary remedy nor the manner in which nor

when the medicines should be administered, but merely acts as the hands of the physician in administering the medicines in the quantities and at the times directed by the physician. It having been agreed that the appellant, Hatfield, has never prescribed for any person, nor treated any human ailment or infirmity by any method, either medical, surgical or mechanical, unless the administration of anesthetics to a patient undergoing or preparing to undergo a surgical operation, and, in the presence and in accordance with the directions of the surgeon, in charge, who prescribes the anesthetic to be administered, it would seem that she is not engaged in the practice of medicine within the meaning of that term, and in accordance with its popular sense.

It is, however, insisted that the legislative authority has defined the meaning of the term "practice of medicine" and that the definition, as given in the statute being the controlling one, that is made the "practice of medicine," which has not heretofore been such and that the rules usually applied heretofore are not applicable to a case under the statutes. It will be observed that sub-section 5, of section 2615, *supra,* has defined the term "practice of medicine," as used in the act, to be the "treatment of any human ailment or infirmity by any method"; and that by section 2618, *supra,* "to open an office for such purpose or to announce to the public in any way a readiness to treat the sick or afflicted, shall be deemed to be engaged in the practice of medicine within the meaning of the act." It having been agreed that the appellant, Hatfield, has never opened an office or announced to the public in any way a readiness to treat the sick or afflicted, disposes of any contention, that she is engaged in the practice of medicine, according to the terms above quoted from section 2618, *supra.*

It remains to be determined, whether the service, she performs, shall be deemed the practice of medicine, within the meaning of sub-section 5, of section 2615, *supra.* It is agreed, as before stated, that she has never prescribed for any person nor treated any human ailment or infirmity by any method, by either medical, surgical or mechanical means, unless the administration of anesthetics to a patient undergoing or preparing to undergo a surgical operation, in the presence of, and according to the directions of the surgeon, in charge, who prescribed the anesthetic to be administered, is the "treatment of any human ailment or infirmity by any method," as the

practice of medicine is defined in the statute to be. While the practice of medicine is one of the most noble and learned professions, it is apparent that such a construction ought not to be given to the statute, which regulates the profession, that the effect of it would be to invade the province of the professions of pharmacy, dentistry or trained nursing, all of which are professions, which relate to the alleviation of the human family of sickness and bodily afflictions, and to make duties belonging to those professions, also "the practice of medicine" within the meaning of the statute. Neither should such a construction be given to it as to deprive the people from all service, which could be rendered to them in sickness and affliction, except gratuitous service, or else by licensed physicians, unless the legislature intended that such should be the result of the enactment of the statute. This court has never been heretofore called upon to define the term "practice of medicine" as defined in the present statute, or to determine what things were or were not within the meaning of that act. As used in the act, the words "treatment of any human ailment or infirmity by any method" only means to undertake the cure of any ailment or infirmity by some method, and it is clear that the legislative authority so understood it, when it enacted the statute. To say that the term "practice of medicine" means the "treatment of any human ailment or infirmity by any method" is only an equivalent to saying that the practice of medicine shall be construed to be the attempt to effect the cure of such ailment by the application of some method, without regard to the method used. To do this, it is necessary that the one undertaking the practice of medicine or to treat any human ailment or infirmity for the purpose of effecting a cure or to alleviate the suffering arising from it, by a method, other than a treatment by medical agencies, must necessarily do the things, which are necessary to be done by one undertaking to practice medicine by medical agencies, alone, and that is, he must make a diagnosis of the symptoms of the ailment to determine what the ailment is; he must furthermore, determine what the remedy should be and how it should be administered and when it should be administered, and then to administer the remedy, either in person or by directions to some one who is associated with the patient. It would be as impossible to treat a human ailment by any other method, without the person attempting it, undergoing the processes of making a diagnosis of the

symptoms and determining, what remedy would be efficacious and then prescribing it, as it would, when one undertakes to effect a cure of a malady by medical agencies, alone. It is contended that the language "the treatment of any human ailment or infirmity by any method" is enlarged by the language preceding it in the same subsection, which is as follows: "To treat the sick or injured or in any way discharge the duties usually performed by physicians, whether by medical, surgical or mechanical means," and hence, that the discharge of any service usually performed by a physician is the practice of medicine within the meaning of the act. Construing all of the language of the sub-section together, however, it is evident that the language, "or in any way discharge the duties usually performed by physicians" must necessarily mean the duties usually performed by physicians, in the practice of medicine, at the time of the enactment of the statute and as understood at that time. The legislature, when undertaking to define the term "practice of medicine," did not include within the definition "the duties usually performed by physicians," but, defined it to be the "treatment of any ailment or infirmity by any method." This view of the language, "in any way discharge the duties usually performed by physicians," is strengthened by the fact, that there is no penalty imposed upon the "discharge of the duties usually performed by physicians," by section 2618, *supra*, or any other portion of the statute, other than upon those, who practice medicine or attempt to practice medicine in any of its branches or those who treat or attempt to treat the sick or afflicted by any system or method, whatsoever. The things usually performed by physicians, which are not the practice of medicine, are not included nor intended to be included in the act. The act specifically provides, that it does not include the services pertaining to the duties of the trained or other nurses, and all of its provisions together mean that it should not apply to the services performed by nurses, and which are not duties belonging to the province of physicians, in the practice of medicine.

It is, however, contended that the trained nurse, who administers an anesthetic, must, at some time, exercise her own judgment and thus bring her within the definition of "to practice medicine," in this, that the surgeon is engaged with his duties in performing the operation and it may become necessary to apply another anes-

7

thetic, instead of the one being used, the fact, that she observes the symptoms, which would make the change necessary and gives notice to the physician, who may then direct her further action. Whether such cases as this arise, which cannot be provided for beforehand is a matter peculiarly within the knowledge of the surgeons, but if such contingency should arise, does it amount to the practice of medicine as defined by our statute, according to the popular sense in which the language to treat any human ailment or infirmity by any method whatsoever was used, and in the sense in which the lawmakers intended? If a physician makes a diagnosis and discovers the ailment of the patient, who is attended by a nurse, and prescribes certain medicines to be given, when the medicine already given shall affect the patient in a certain way, to determine when the medicine should be given requires the exercise of some degree of judgment by a nurse; or if the physician should direct the nurse to administer a certain potion when the pulsation of the patient should be quickened or when his temperature should arise, or if he should direct her to bathe the patient to allay a fever, when it should arise, in all these contingencies, the nurse would have to exercise some degree of judgment, but to hold that such would constitute her a practitioner of medicine and prohibit her from the rendition of such services, it would have the effect, as said in Nelson v. State Board of Health, *supra*, "to deprive the people of all services in sickness, other than those which are gratuitous, except when rendered by a licensed physician."

The practice of surgery is one method of the "practice of medicine," and consists of an attempt to cure or alleviate a bodily infirmity or ailment by surgical means, that is, to treat the ailment or infirmity by applying manual operations or instrumental appliances, or by the use of the surgical knife. To enable the patient to bear the operation with a greater degree of safety and to recover from the effects of it more surely and rapidly, oftentimes, his general physical condition is improved by the administration of medicines beforehand; he is bathed and certain portions of the body specially sterilized to prevent infection of any kind, and anesthetics administered to deaden the pain of the operation. The duties are performed by assistants selected by the surgeons, and who perform them under his direction and supervision, and when performed by them, as directed, without

diagnosis of the disease or prescribing the remedy, or the medicines to be used, or making use of the surgical means to cure or alleviate the disease, but only act as the hands of the surgeon, have never, in the popular sense, been considered as practicing surgery, or treating a disease or ailment by surgical means. Beile v. Travelers' Protective Association, 155 Mo. App. 629.

It is the duty of the surgeon, who would undertake a surgical operation to make a diagnosis of the symptoms of the patient, to determine his ailment, and the remedy necessary, and if he determines that an anesthetic is necessary for the performance of the operation, to determine what anesthetic is necessary and the manner of its administration, and to give the necessary directions for so doing and to supervise and direct its giving, and in the selection of an assistant to administer the anesthetic, he should exercise the same degree of knowledge, skill and care as he is required by law to exercise in the performance of any part of the operation. 30 Cyc. 1581.

We are of the opinion that in the performance of the services by appellant, Hatfield, in the way and under the circumstances as agreed upon, as being the facts in this case, that she is not engaged in the practice of medicine within the meaning of the statute laws upon that subject, and hence the judgment appealed from is reversed and the cause remanded for proceedings consistent with this opinion.

Whole court sitting, Chief Justice Settle dissenting.